*In re* PEOPLE v JORY

GENESEE PROSECUTOR v GENESEE CIRCUIT JUDGE

Docket No. 93232. Argued March 3, 1993 (Calendar No. 9). Decided
August 31, 1993.

The Genesee Prosecutor brought an action for superintending
control in the Court of Appeals, seeking reinstatement of the
jury verdict in *People v Alan D Jory* in the Genesee Circuit
Court and a remand for resentencing. In *Jory,* the defendant
was convicted of obtaining money by false pretenses, in part on
the basis of his failure to disclose the existence of a mortgage
on property he sold on a land contract. The trial court, James
S. Thorburn, J., directed a verdict of acquittal for the defendant
and dismissed the case. The Court of Appeals, BRENNAN, P.J.,
and SHEPHERD and GRIFFIN, JJ., directed reinstatement of the
defendant's conviction, in an unpublished opinion per curiam,
relying on the holding of *People v Etzler,* 292 Mich 489 (1940),
that failure to disclose the existence of an encumbrance on
property subject to a sales transaction can constitute a false
pretense (Docket No. 129650). Jory appeals.

In an opinion by Justice GRIFFIN, joined by Chief Justice
CAVANAGH, and Justices LEVIN, BRICKLEY, RILEY, and MALLETT,
the Supreme Court *held:*

Under some circumstances, failure to disclose a known mort-
gage or other encumbrance to the purchaser of property may
fall within the meaning of false pretense as used in MCL
750.218; MSA 28.415.

1. The elements of obtaining money under false pretenses
are: a false representation of an existing fact, knowledge of the
falsity of the representation, an intent to deceive, and detri-
mental reliance by the victim. A false pretense can be the
failure to speak when it is necessary to do so.

2. In this case, the defendant made no affirmative false
representation. Nor was it shown that he knew that the land
contract purchaser was unaware of the mortgage or that he
intended to defraud her. Rather, review of the record compels
the conclusion that a rational trier of fact could not have so
found beyond a reasonable doubt.

3. Because the trial court reached the correct result, albeit
for the wrong reason, its decision need not be disturbed.

Reversed; directed verdict of acquittal reinstated.

Justice BOYLE concurred only in the result.

1. FALSE PRETENSES — FAILURE TO DISCLOSE — LAND CONTRACTS.
   Under some circumstances, failure to disclose a known mortgage or other encumbrance to the purchaser of property may fall within the meaning of false pretense (MCL 750.218; MSA 28.415).

2. FALSE PRETENSES — FAILURE TO DISCLOSE.
   A false pretense can be the failure to speak when it is necessary to do so.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Arthur A. Busch,* Prosecuting Attorney, and *Donald A. Kuebler,* Chief, Appellate Division, for the people.

*Peter M. Doerr* for the defendant.

GRIFFIN, J. We are called upon to decide whether failure by a seller to disclose the existence of a mortgage on real property sold under a land contract may constitute a false pretense within the meaning of MCL 750.218; MSA 28.415.[1]

---

[1] Any person who, with intent to defraud or cheat, shall designedly, by color of any false token or writing or by any false or bogus check or other written, printed or engraved instrument, by spurious coin or metal in the similitude of coin, or by any other false pretense, cause any person to grant, convey, assign, demise, lease or mortgage any land or interest in land, or obtain the signature of any person to any written instrument, the making whereof would be punishable as forgery, or obtain from any person any money or personal property or the use of any instrument, facility or article or other valuable thing or service, or by means of any false weights or measures obtain a larger amount or quantity of property than was bargained for, or by means of any false weights or measures sell or dispose of a less amount or quantity of property than was bargained for, if such land or interest in land, money, personal property, use of such instrument, facility or article, valuable thing, service, larger amount obtained or less amount disposed of, shall be of the value of $100.00 or less, shall be guilty of a misdemeanor; and if such land, interest in land, money, personal property, use of such instrument, facility or article, valuable thing, service, larger amount obtained or less amount disposed of shall be of the value of more than $100.00,

Although we conclude that, under some circumstances, failure to speak when it is necessary to do so can be a false pretense, we reverse the Court of Appeals decision in this case because other elements of the offense were not sufficiently established to support a conviction.

I

Defendant[2] Alan Jory was convicted by a jury of obtaining money by false pretenses, MCL 750.218; MSA 28.415, in part on the basis of his failure to disclose the existence of a mortgage on property he sold on a land contract to the seventy-one year old complainant, Pearl Brumit. Although Mrs. Brumit made timely payments on the land contract, defendant defaulted in his obligation to make payments on the mortgage, which resulted in foreclosure of the mortgage and transfer of title to the mortgagee.

In 1978, Brenda Marble financed the purchase of a house and lot on Branch Road in the City of Flint by executing a mortgage in favor of the Guardian Mortgage Company as security for an obligation of $22,750, with interest at 8.75 percent.[3] Later, Marble moved to a second house and rented the Branch Road property.

Marble hired defendant Jory to remodel her second house. Upon learning that he was a licensed real estate broker, Marble asked defendant to sell the Branch Road property for her. In 1984,

such person shall be guilty of a felony, punishable by imprisonment in the state prison not more than 10 years or by a fine of not more than $5,000.00. [MCL 750.218; MSA 28.415.]

[2] The trial judge is the nominal defendant because this is a superintending control case. See *infra*, pp 411-412.

[3] At the time, Brenda Marble was married and took title with her husband. However, she later divorced, and it appears that she acquired her husband's interest as a result of the divorce judgment.

defendant purchased the property himself for $25,500 from Brenda Marble, who conveyed her interest to defendant by a warranty deed, which referred to the Guardian mortgage. Marble testified that, in accordance with her agreement with defendant, she discounted the purchase price by $4,000 in lieu of payment for defendant's remodeling services, and defendant informally agreed to assume the mortgage.[4]

After acquiring title, defendant rented the subject property to a daughter of Mrs. Brumit under a lease that included an option to purchase. Later, when health problems forced the daughter to relocate to a warmer climate, the complainant moved into the house. Subsequently, Mrs. Brumit initiated negotiations and agreed to purchase the house from defendant under a land contract, for a purchase price of $27,900, with an eleven percent interest rate. She made a $1,600 down payment and agreed to pay defendant $337 per month to amortize the balance. The land contract, which was prepared by defendant and made no reference to the mortgage, was signed by the complainant and her two sons at a closing conference on December 3, 1985, in the presence of the defendant's business associate, Oscar Manning. Defendant was not present at the closing.

At trial, Mrs. Brumit testified that when she signed the land contract, she was not aware of a mortgage on the property. She did not recall whether she spoke with defendant or Mr. Manning when earlier she had initiated negotiations to buy the house. She stated that she conversed with both defendant and Mr. Manning about the property before signing the land contract; however, she

---

[4] At trial, an officer of the Guardian Mortgage Company testified that the company's records showed no formal assumption of the mortgage by defendant.

could not remember how many discussions transpired or the dates of the conversations. She testified that at no time, either before or after signing the contract, did defendant or his business associate, Mr. Manning, ever tell her of the existence of the Guardian mortgage.

Mrs. Brumit denied having any discussions with defendant or Mr. Manning about alternative ways to finance her purchase of the property. She denied that she bought the property on a land contract because the closing costs would be less than if she had purchased it by means of a new mortgage. However, she stated that she could not recall the substance of her discussions with either defendant or Mr. Manning.

Mrs. Brumit testified that she believed the defendant owned the property when she entered into the land contract. This belief, she said, was not based upon an express representation of ownership by defendant, but upon his comment to her that he would be saving the money from the land contract payments for his children's college education.

Mrs. Brumit claimed that if she had been informed of the existing mortgage, she would have acquired the property in a "different way"—by making arrangements directly either with Marble or the Guardian Mortgage Company.

At the closing, Mr. Manning presented the land contract to Mrs. Brumit with defendant's signature already affixed. At first, Mrs. Brumit testified that the land contract was the only document she saw that day; however, upon further questioning she said she could not remember whether other papers were presented to her for review or for her signature.

Mrs. Brumit's two sons, Karl Brumit and Gordon Duehring, were also present at the closing,

and each signed the land contract. Both testified that they were never informed at any time by defendant or Mr. Manning that there was an outstanding mortgage on the property. Each of the sons said he had met defendant on only one prior occasion. Karl Brumit recalled signing other papers at the closing, but he did not remember the contents of the other papers. Duehring testified that no documents were reviewed at the closing other than the land contract, although he said he did see other paperwork on Mr. Manning's desk.

By contrast, Mr. Manning, the sole defense witness at trial, testified that he told Mrs. Brumit about the underlying mortgage before she signed the land contract. He maintained that he had explained to Mrs. Brumit that there were different methods by which the property could be purchased, i.e., she could obtain a new mortgage, or assume the underlying mortgage, or purchase by land contract. He said Mrs. Brumit chose the land contract method because she did not have enough money at the time to assume the underlying mortgage.

Mr. Manning testified that he spoke with Mrs. Brumit on three or four occasions before the closing conference and that he had discussed the underlying mortgage with her on more than one of these occasions, explaining to her that it was an assumable mortgage and that she "could probably get a little better buy on the house because she could simply assume it and it will add a little better interest rate than a land contract would have."

According to Mr. Manning, he presented Mrs. Brumit at the closing with a full package of papers, including affidavits regarding sewer, water, and tax information, and the closing statement.

Mr. Manning testified that he reviewed with Mrs. Brumit a title search of the property that extended through June 1985, and that he also showed her the warranty deed from Brenda Marble to the Jorys, which expressly referred to the underlying mortgage. Mr. Manning claimed also that he had earlier shown Mrs. Brumit a listing agreement that recited the existence of the mortgage. He further testified that Mrs. Brumit expressed no concern about the underlying mortgage to him. Mrs. Brumit was not provided with title insurance or an abstract of title at the closing. Mr. Manning claimed that the sons of Mrs. Brumit should have been aware of the mortgage because they were at the closing with their mother. In his testimony, Mr. Manning conceded that he was a "close friend," as well as a business associate of the defendant.

There was no testimony at trial that defendant had ever denied the existence of the mortgage or had ever asserted that his title was free of encumbrances.

Mrs. Brumit made timely and regular land contract payments to defendant, but defendant, after making five or six payments, failed to make further payments on the underlying mortgage. Thereafter, in July 1985, Guardian Mortgage Company contacted one of the original mortgagors, Brenda Marble, who in turn twice contacted defendant by telephone concerning the arrearage. After several foreclosure warning letters were received by Marble, she visited Mrs. Brumit at her house in the winter of 1986, thinking that she was responsible for the arrearage. Mrs. Brumit testified that it was at this time that she first learned of the mortgage. Marble said she telephoned defendant from Mrs. Brumit's house, and, according to Marble, he

agreed to apply Mrs. Brumit's land contract payments directly to the mortgage.[5]

Mrs. Brumit continued to make land contract payments to defendant for another few months, until a Guardian Mortgage Company representative came to the house, informed her of the mortgage default, and posted a foreclosure notice. Mrs. Brumit moved out of the house. An arrearage of $985 in mortgage payments was owing at the time of foreclosure, and the redemption amount of the mortgage was $22,787. As a result of a foreclosure sale, title to the subject property was acquired by the Guardian Mortgage Company.

Thereafter, the Genesee County prosecutor charged defendant with larceny by false pretenses under MCL 750.218; MSA 28.415, and, following a two-day trial, a jury found him guilty as charged.

After imposing a flat sixty-day jail sentence, the trial court addressed defendant's motion for a directed verdict, which had been taken under advisement during the trial. In an oral opinion the trial court granted the motion, and vacated the conviction, stating:

> The Court's of the opinion that as there was no representation which was false, for that reason, there would not be a good case of false pretenses.

The Court of Appeals, relying on *People v Etzler,* 292 Mich 489, 491-492; 290 NW 879 (1940), ordered reinstatement of defendant's conviction and opined: "Contrary to the trial court's ruling, the failure to disclose the existence of an encumbrance on property that is the subject of a sales

---

[5] These representations that Jory would apply all future payments received from the vendee to the existing mortgage were never charged by the prosecutor as a violation of the false pretenses statute.

transaction can constitute a false pretense."[6] Citing *People v Austin,* 191 Mich App 468; 478 NW2d 708 (1991), the Court also ruled that the flat sixty-day jail sentence imposed by the trial court was invalid under MCL 769.8; MSA 28.1080, the indeterminate sentencing act. Unpublished opinion per curiam, decided January 23, 1992 (Docket No. 129650).

We granted defendant's application for leave to appeal, 441 Mich 880 (1992). Our review focuses on two concerns: (1) whether, as stated in *Etzler,* failure to speak can be a false pretense, and (2) whether the elements of the charged offense were sufficiently established to withstand a motion for directed verdict.[7]

II

In Michigan, as in other jurisdictions, the crime of obtaining money under false pretenses was created by statute. MCL 750.218; MSA 28.415 in pertinent part provides:

Any person who, with intent to defraud or cheat, shall designedly by . . . false pretense . . . obtain from any person any money . . . if

---

[6] After judgment on the directed verdict was entered, the prosecutor sought to appeal, but the Court of Appeals dismissed the appeal. The prosecutor then filed a complaint for superintending control in the Court of Appeals seeking reinstatement of the jury verdict and resentencing. By peremptory order, the Court of Appeals reinstated the conviction, but denied the prosecutor's request for resentencing. Both the prosecutor and defendant then applied to this Court for leave to appeal, and we remanded the case to the Court of Appeals for plenary consideration. 434 Mich 916 (1990). After remand, the Court of Appeals, in a brief per curiam opinion, reinstated defendant's conviction and ordered resentencing.

[7] Defendant also appeals from the Court of Appeals determination that the sixty-day sentence was invalid as a violation of the indeterminate sentencing statute. However, because we conclude that the directed verdict of acquittal was proper, it is unnecessary for us to reach this issue.

such . . . money . . . shall be of the value of more than $100.00, such person shall be guilty of a felony, punishable by imprisonment in the state prison not more than 10 years or by a fine of not more than $5,000.00.

This Court has stated:

"The design of the statute was to protect the weak and shield the credulous against the arts and wiles of the shrewd and designing; and the real question on this point ought to be, and under the statute and in reason is, Was the pretense designedly false, and made to induce the action claimed, and was it successful?" [*People v Summers,* 115 Mich 537, 545; 73 NW 818 (1898). See also *People v Wogaman,* 133 Mich App 823, 826; 350 NW2d 816 (1984).]

The case law instructs that there are four elements of this offense: "(1) a false representation as to an existing fact; (2) knowledge by defendant of the falsity of the representation; (3) use of the false representation with an intent to deceive; and (4) detrimental reliance on the false representation by the victim." *People v Gould,* 156 Mich App 413, 416; 402 NW2d 27 (1986); see also *People v Larco,* 331 Mich 420, 429; 49 NW2d 358 (1951); *People v Phebus,* 116 Mich App 416, 419; 323 NW2d 423 (1982).

Because in this case it is conceded by the prosecutor that defendant made no affirmative false representation, we consider first the threshold question whether his silence under any circumstances could constitute a false pretense within the meaning of the statute.

A

In *People v Etzler, supra,* an automobile dealer-

ship borrowed money to conduct its business and gave as security what purported to be a "floor plan" chattel mortgage on automobiles in inventory. Under the terms of the mortgage, the dealer agreed not to sell or remove any of the mortgaged automobiles from its premises without first obtaining a release of the mortgage. Defendant, on behalf of the dealership, then sold and delivered a car to a purchaser without securing a release or disclosing the existence of the mortgage. The mortgagee-finance company replevied the automobile from the purchaser, who then settled with the finance company by agreeing to pay the balance due on the mortgage. Thereafter, the defendant was charged and convicted of obtaining money under false pretenses.

The *Etzler* Court opined that a false pretense can be the failure to speak when it is necessary to do so:

> Defendant asks us to hold that mere failure to disclose the existence of an incumbrance without an affirmative statement in so many words that there was no incumbrance is insufficient proof of intent to obtain money by means of false pretenses. We cannot so rule. The false pretense can be the failure to speak when it is necessary to do so. If defendant sold the new automobile without revealing the fact that it was mortgaged, he was deliberately acting a falsehood, and such conduct is as objectionable as a spoken falsehood. *People v Clark,* 10 Mich 310 [1862]. One may make false pretense by act as well as by word. *People v Schultz,* 210 Mich 297 [178 NW 89 (1920)]. [*Id.,* pp 491-492.]

However, because of a technical deficiency in the execution of the chattel mortgage, the *Etzler* Court was required to reverse the conviction. In this

appeal, defendant contends that the quoted statements from *Etzler* cannot be regarded as authority because that Court reversed the defendant's conviction on other grounds. We acknowledge that the *Etzler* reasoning is obiter dicta. However, we do not reject it; rather, we take this opportunity to affirm it.[8]

B

Clearly, a seller's affirmative misrepresentation that property is free from encumbrances may provide a basis for conviction for obtaining money by false pretenses. *Griffin v State,* 352 So 2d 843 (Ala App, 1977); *State v Wallace,* 25 NC App 360; 213 SE2d 420 (1975); *State v Banks,* 24 NC App 604; 211 SE2d 860 (1975); *People v Lee,* 259 Mich 355; 243 NW 227 (1932); *Smith v State,* 86 Fla 525; 98 So 586 (1923); *Brown v State,* 6 Ga App 329; 64 SE 1001 (1909); *Slaughter v Commonwealth,* 222 Ky 225; 300 SW 619 (1927); *Commonwealth v Grady,* 76 Ky 285 (1877); 32 Am Jur 2d, False Pretenses, § 31, p 257.

The question not so easily answered is whether the mere nondisclosure of a known encumbrance in a real estate sales transaction can amount to criminal conduct under the false pretenses statute.

---

[8] "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." [*Breckon v Franklin Fuel Co,* 383 Mich 251, 267; 174 NW2d 836 (1970), quoting *Cohens v Virginia,* 19 US (6 Wheat) 264, 399; 5 L Ed 257 (1821).]

Many courts, in a variety of contexts, have embraced the notion expressed in *Etzler, supra,* that a false pretense may be made by actions as well as by words. Consequently, under some circumstances, prosecution for false pretenses has been based on silence or concealment. See, e.g., *Carter v State,* 386 So 2d 1102 (Miss, 1980); *State v West,* 252 NW2d 457 (Iowa, 1977); *Smith v State,* 74 Fla 594; 77 So 274 (1917); *Brown v State,* 37 Tex Crim App 104; 38 SW 1008 (1897); 32 Am Jur 2d, *supra* at § 17, pp 250-251. Contra: *Rogers v People,* 161 Colo 317; 422 P2d 377 (1966); *Stumpff v People,* 51 Colo 202; 117 P 134 (1911); *Griffith v State,* 3 Ga App 476; 60 SE 277 (1908).

An early Michigan case that touches upon the issue at hand is *People v Clark, supra.* There, the defendant defrauded the complainant of $10 by leading him to believe that he was a hog dealer who had property in transit, needed the money immediately for freight charges, but would pay back the complainant as soon as he changed a $100 bill. The Court held:

> If these pretenses were false, and if they actually deceived Whelpley, and were designed to defraud him out of the money he advanced, they amount to misrepresentations of existing and material facts, and come clearly within the mischief of the law. Nor do we think it could make any difference whether they were all expressed in words. Falsehood when deliberately acted is the same as spoken falsehood. [*Id.,* p 317.]

Subsequent Michigan decisions, including *Etzler, supra,* have cited *Clark* for the proposition that silence may form the basis for a false pretense prosecution. See *People v Schultz, supra* at 301-302; *People v Vida,* 2 Mich App 409; 140 NW2d

559 (1966). See also *People v Taurianen,* 102 Mich App 17; 300 NW2d 720 (1980).

Michigan cases involving fraud, the civil cousin of the crime of false pretenses, also recognize that "[f]raud may be consummated by suppression of facts and of the truth, as well as by open false assertions." *Fred Macey Co v Macey,* 143 Mich 138, 153; 106 NW 722 (1906). "When the circumstances surrounding a particular transaction are such as to require the giving of information, a deliberate and intentional failure to do so may properly be regarded as fraudulent in character." *Ainscough v O'Shaughnessey,* 346 Mich 307, 316; 78 NW2d 209 (1956). " 'The concealment of a fact which one is bound to disclose is an indirect representation that such fact does not exist, and constitutes fraud.' " *Groening v Opsata,* 323 Mich 73, 84; 34 NW2d 560 (1948). See also *United States Fidelity & Guaranty Co v Black,* 412 Mich 99, 124-128; 313 NW2d 77 (1981); *Nowicki v Podgorski,* 359 Mich 18; 101 NW2d 371 (1960); *Sullivan v Ulrich,* 326 Mich 218, 227-228; 40 NW2d 126 (1949); *McMullen v Joldersma,* 174 Mich App 207; 435 NW2d 428 (1988).

The Model Penal Code, § 223.3, "Theft by Deception," addresses the problem of nondisclosure in the present context, recommending in pertinent part:

> A person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely:
>
>            *     *     *
>
> (4) fails to disclose a known lien, adverse claim or other legal impediment to the enjoyment of property which he transfers or encumbers in consideration for the property obtained, whether such

impediment is or is not valid, or is or is not a matter of official record.[9]

We conclude that the view expressed in *Etzler* is correct, viz., that under some circumstances, the failure to disclose a known mortgage or other encumbrance to the purchaser of property may fall within the meaning of a "false pretense" as that term is used in the statute. An encumbrance may significantly affect the marketability of real estate and its nondisclosure may interfere with or terminate the purchaser's interest in the property, which was bargained for on the basis of the false assumption that there was no impediment to clear title.[10]

---

[9] The revised comment to the Model Penal Code, ALI 1980, notes that at least twenty state model codes have followed in substance the language of subsection 4. Revised comment, § 223.3, p 200, n 56. Michigan is one of those jurisdictions. The Michigan Revised Criminal Code, Final Draft, September 1967, § 3201 provides:

> The following definitions are applicable in this chapter unless the context otherwise requires:
> (a) "Deception" occurs when a person knowingly:
>
> \* \* \*
>
> (iv) Sells or otherwise transfers or encumbers property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether that impediment is or is not valid, or is or is not a matter of official record . . . .

[10] The fact that a mortgage is a matter of public record is no defense to a prosecution for false pretenses. The recording statute, MCL 565.25; MSA 26.543, provides:

> In the entry book of deeds, the register shall enter all deeds of conveyance absolute in their terms, and not intended as mortgages or securities . . . . [A]nd in the entry book of mortgages he shall enter all mortgages and other deeds intended as securities, and all assignments of any such mortgages or securities; . . . [a]nd the record of such . . . papers required by statute to be recorded . . . shall be notice to all persons, of the liens, rights and interests acquired by or involved in such proceedings, and all subsequent owners or incumbrances shall take subject to such liens, rights or interests.

Nondisclosure of a known encumbrance must, however, if it is to be deemed a criminal act under the false pretenses statute, be committed with fraudulent intent. The statute requires that a defendant act "designedly" with "intent to defraud." MCL 750.218; MSA 28.415. See, e.g., *People v Clark, supra* (pretenses "designed to defraud" and "deliberately acted"); Model Penal Code, § 223.3 ("[a] person deceives if he *purposely* . . . fails to disclose a known lien").

Interpreting a similar statute, the Supreme Court of South Dakota explained that "[t]he word 'designedly' in our criminal statute has . . . a well-recognized meaning. It covers the case only of affirmative evil intent; that is, the man who knew or believed that his representation was false . . . ." *State v Pickus,* 63 SD 209; 257 NW 284, 295 (1934). In the context of the nondisclosure

We employ the reasoning of other jurisdictions, where it has been held that a defendant who obtains money or property by an affirmative misrepresentation that the property is free from encumbrances is not relieved from guilt by the fact that the purchaser could have detected the fraud by examining the public records. See, e.g., *Slaughter v Commonwealth, supra* at 237 ("to our minds it would be nothing short of flagrant disregard of the high public policy that the Legislature had in view in enacting the statute to hold that it could be defeated, if the laymen to whom most generally such pretenses are made, was [sic] required to disbelieve the false pretender, and to search the records, and to discover all possible incumbrances"); *State v Foot,* 100 Mont 33; 48 P2d 1113 (1935); *Keyes v State,* 197 Ill 638; 64 NE 730 (1902); *State v Trisler,* 490 Ohio St 583; 31 NE 881 (1892); *Smith v State, supra; Brown v State, supra; Moneyham v State,* 69 Fla 577; 68 So 758 (1915); anno: *Fraudulent misrepresentation or concealment by a contracting party concerning title to property or other subjects which are matters of public record,* 33 ALR 853, §§ 97-98, pp 1146-1155, and cases cited therein; Model Penal Code, *supra;* contra: *Criner v State,* 92 Fla 483; 109 So 417 (1926). See also the following civil fraud cases: 3 Restatement Torts, 2d, § 540, comment b, p 88; *Weber v Weber,* 47 Mich 569; 11 NW 389 (1882); *Bristol v Braidwood,* 28 Mich 191 (1873); *Schoedel v State Bank of Newburg,* 245 Wis 74; 13 NW2d 534 (1944); *Loverin v Kuhne,* 94 Conn 219; 108 A 554 (1919); anno: 33 ALR 853, *supra; Johnson v Campbell,* 199 Mich 186, 191; 165 NW 823 (1917); *Schweyer & Co v Mellon,* 196 Mich 590, 596; 162 NW 1006 (1917); *Smith v Werkheiser,* 152 Mich 177, 180; 115 NW 964 (1908); *Smith v McDonald,* 139 Mich 225; 102 NW 738 (1905).

of a known encumbrance in the sale of real property, then, a seller could be found to have acted "designedly" only if he knew of the existence of the encumbrance, knew that the buyer did not know of the encumbrance, and purposely failed to disclose the existence of the encumbrance.

In addition to knowledge, a defendant must have had the intent to defraud. As this Court stated in an earlier case, "intent [is] a necessary ingredient of the offense . . . ." *People v Smith,* 271 Mich 553, 565; 260 NW 911 (1935); see also *People v McCoy,* 75 Mich App 164, 175; 254 NW2d 829 (1977). Where there is no proof of intent, a conviction must be reversed. *People v Beaudoin,* 7 Mich App 461, 463; 151 NW2d 868 (1967).[11]

Intent generally may be inferred from the facts and circumstances of a case. *People v Phillips,* 385 Mich 30, 37; 187 NW2d 211 (1971). "Where a defendant's acts are of themselves commonplace or equivocal, and are as consistent with innocent activity as they are with criminal, it will be necessary for the government to adduce objective facts to establish criminal intent." *Seeney v United States,* 563 A2d 1081, 1083-1084 (DC App, 1989).

### III

In the light of that background, we turn next to consider whether a rational trier of fact, considering the evidence presented before defendant's motion for directed verdict, could find beyond a reasonable doubt in this case that defendant failed to disclose the mortgage with the intent to defraud the complainant. In our review, we are cognizant

---

[11] The statute contains the language "with intent to defraud," and since the record contains no proof of such intent, the answer to this question is in the negative. Such answer requires reversal . . . . [7 Mich App 463.]

that such evidence must be viewed in a light most favorable to the prosecution. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979).

As earlier noted, there is no evidence that the defendant ever denied the existence of a mortgage or ever affirmatively represented that his title was free of all encumbrances. It is clear from the record that Mrs. Brumit assumed that defendant Jory owned the property when he sold it to her on land contract. She testified:

> *Q.* Why did you believe that Mr. Jory owned the property?
> *A.* Well, you usually don't go around selling property that don't belong to you.
>
> * * *
>
> *Q.* Why do you believe or why did you believe when you signed the land contract that Mr. Jory owned the property? What lead [sic] you to believe that?
> *A.* Well, he told me he was gonna take that money and put it—away for his kids to go to school.
> *Q.* Who told you that . . .
> *A.* To go to college. He did.
> *Q.* Who's he?
> *A.* Mr. Jory.

Despite defendant's silence in other respects, we believe it would have been reasonable to draw from the evidence the inference that defendant Jory had represented to Mrs. Brumit that he was the owner of the property. However, a representation of "ownership" of property, even though it may be encumbered, does not constitute grounds for prosecution for false pretenses, as long as, at the time the representation is made, the person making it has an equitable interest in, and some kind of legally cognizable title to, the property.

*Burroughs v State,* 21 Md App 648; 320 A2d 587
(1974); *State v Jeffcoat,* 279 SC 167; 303 SE2d 855
(1983); *People v Alexander,* 663 P2d 1024 (Colo,
1983); *Graf v State,* 118 Neb 485; 225 NW 466
(1929); *Criner v State,* 92 Fla 483; 109 So 417
(1926); 32 Am Jur 2d, False Pretenses, § 30, p 257.

We find it more difficult to add the further
inference that, either by his silence or his spoken
words, defendant "designedly" represented to Mrs.
Brumit that his title was free of all encum-
brances.[12] Any effort to extract the requisite "in-
tent to defraud" from defendant's silence with
regard to the mortgage is particularly challenging.

The crux of Mrs. Brumit's complaint is that
defendant did not tell her about the underlying
mortgage before she signed the land contract.[13]
While that assertion is vehemently disputed, even
accepting that assertion as fact, there is a dearth
of evidence in the record about why defendant was
silent. Was defendant's failure to speak a calcu-
lated effort to deceive and defraud the complain-
ant, or was the omission made honestly or other-
wise without fraudulent intent?

Although defendant was a licensed real estate
broker with an obvious knowledge of real estate
practices, the complainant was not a stranger to
real estate transactions. She testified that she
owned four other parcels of property. Despite her
age, seventy-one, there is no evidence in the record
that she was physically or mentally impaired, or
that defendant used his status as a broker to take
undue advantage of her. On the contrary, the

---

[12] While the trier of fact may draw reasonable inferences from
facts of record, it may not indulge in inferences wholly unsup-
ported by any evidence . . . . [*People v Petrella,* 424 Mich 221,
275; 380 NW2d 11 (1985).]

[13] For this reason, we consider the evidence as it relates to the
negotiations up to and including the execution of the contract.

record makes clear that the significant details of the transaction were handled, not by defendant, but by an associate. Despite the close relationship between defendant and his associate, Mr. Manning, there is no evidence of a conspiracy between the two.

The complainant, Mrs. Brumit, initiated the negotiations which led to her purchase of the property.[14] Her testimony regarding her interaction with defendant in the time period preceding her signing of the land contract was unspecific and uncertain at best. She could not recall the substance of any conversations, the number of meetings with defendant, or when any such conversations took place. Although the complainant testified that she spoke with both defendant and Mr. Manning about the land contract method of purchasing the property, she could not recall what either had said during these conversations.[15]

---

[14] On cross-examination by defense counsel, Mrs. Brumit explained that her daughter had occupied the house under a lease with an option to purchase, but had defaulted on the lease. She then decided to buy the property:

> And then I just—her furniture and everything was there and when I come home from work one day I noticed the doors all open and that people [had] been in there, so I locked the doors and I went and saw him and I bought the place. Just left her furniture there and I moved in until she come back from Arizona.

[15] On cross-examination by defense counsel, she testified as follows:

> *Q.* And did you speak to Mr. Manning or Mr. Jory when you initiated your negotiations?
> *A.* I don't remember which one.
> *Q.* Okay, so you can't say that either; is that right? I just want to know what you recall?
> *A.* No, I don't recall.
> *Q.* So you can't recall . . .
> *A.* Because they we both . . .
> *Q.* What you're telling me is you can't recall whether you talked to Jory or Manning when you initiated your discussions; is that right?

As already indicated, defendant was not present at the closing conference. There was no testimony that indicates that defendant's absence or peripheral involvement in the sale was a deliberate or calculated ploy to mislead the complainant into signing the land contract or otherwise to defraud her. Similarly, no evidence was introduced to show any requirement of reference to the mortgage in the land contract, or that such a reference was intentionally omitted with a purpose of defrauding Mrs. Brumit.[16]

Reasonable doubt about the existence of fraudulent intent under the circumstances presented is underscored by the particular nature of the transaction. Unlike situations involving an outright sale of real property, defendant retained a significant interest in the property when he sold under a land contract. Thus, while the complainant suffered the loss of her equitable interest as a result of the

*A.* I think it was him.

*Q.* But you can't say? Is that what you're saying?

*A.* I believe it was Mr. Jory because—and then I had talked to his mother on it too.

*Q.* And what was the substance of the . . .

*A.* But Mr. . . . .

*Q.* Pardon me?

*A.* Mr. Manning is the one that brought the contract over.

*Q.* Okay, that is not the person we're talking about now. Either it was Mr. Jory or his mother you're telling me?

*A.* Yes.

*Q.* And what was the substance of the conversation?

*A.* I don't remember.

*Q.* Okay, at any rate you initiated a sale; is that right?

*A.* Between the two of them, yes.

*Q.* And you can't remember exactly what happened?

*A.* No.

[16] At the May 1, 1989, hearing on the motion for directed verdict, the prosecution argued that the defendant was required by regulation to disclose the existence of the mortgage. However, no such regulations were introduced into evidence and the trial judge refused to take judicial notice of any such regulations.

default, it does not appear that defendant gained advantage by his silence; in fact, he was also damaged and lost his interest in the property as a result of the foreclosure.

We further observe that the terms of this transaction were commonplace to people familiar with real estate transactions, and that it is not unusual for property already encumbered to be sold on a land contract, at least where the outstanding balance on the encumbrance is less than the balance owing on the land contract.

Our review of the record in the case at bar compels the conclusion that a rational trier of fact could not find beyond a reasonable doubt that defendant "designedly" and with "intent to defraud" failed to disclose that the property sold on land contract to the complainant was unencumbered. At most, the record shows only that defendant failed to disclose the existence of an encumbrance on the property, that complainant was unaware of the encumbrance, and that if she had known of the encumbrance she would not have signed the land contract.

In an early case, this Court explained that even the proof of a falsehood was insufficient to justify an inference of intent to defraud:

The simple fact of procuring, by falsehood, the indorsement, was not an offense within the statute; it must have been procured with the intent to defraud, and where an intent is made the gist of an offense, that intent must be shown by such evidence as, uncontradicted, will fairly authorize it to be presumed beyond a reasonable doubt. It is true that a man is presumed to intend the natural consequences of his acts, but, under this statute, it is not the consequence, but the intention, which

> fixes the crime. . . . It was, therefore, necessary for the prosecutor to show something more than the application, the falsehood, and the indorsement, before he could ask a conviction; he should have shown those facts which, in the absence of all other proof, would warrant the jury in finding an intent to defraud, unless such intent is fairly to be inferred from the circumstances attending the act itself. [*People v Getchell,* 6 Mich 496, 504-505 (1859). See also *McCoy, supra,* 75 Mich App 176.]

Likewise, in the case at bar, mere failure to disclose the existence of an encumbrance is insufficient to support, beyond a reasonable doubt, the inference that defendant acted "designedly," and with intent to defraud.

Although the trial court incorrectly premised its decision upon the absence of an affirmative misrepresentation, we conclude that the trial court reached the correct result when it granted the defendant's motion for directed verdict. Where a trial court reaches the correct result for the wrong reason, its decision need not be reversed on appeal. *Mulholland v DEC Int'l Corp,* 432 Mich 395, 411, n 10; 443 NW2d 340 (1989).

## IV

For the reasons set forth, we reverse the decision of the Court of Appeals and reinstate the trial court's order granting defendant's motion for a directed verdict of acquittal.

CAVANAGH, C.J., and LEVIN, BRICKLEY, RILEY, and MALLETT, JJ., concurred with GRIFFIN, J.

BOYLE, J., concurred only in the result.