# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

JOHN EDWARD BARRITT,

      Defendant-Appellee.

FOR PUBLICATION
February 14, 2017
9:05 a.m.

No. 333206
Genesee Circuit Court
LC No. 15-038224-FC

Before: K. F. KELLY, P.J., and GLEICHER and SHAPIRO, JJ.

SHAPIRO, J.

The prosecution brings this interlocutory appeal[1] from the trial court's decision to suppress statements made by defendant during a police interview conducted without the provision of *Miranda*[2] warnings. Because defendant was subject to custodial interrogation we affirm.

## FACTS AND PROCEDURE

On May 4, 2015, the Mount Morris Township police department contacted the Calhoun County Sheriff's Department asking for their assistance in locating Amy Wienski, who had been reported as missing. Wienski was not at home when deputies arrived, and, suspecting foul play, the deputies obtained and executed a search warrant. While the deputies were at the home, defendant, who was Wienski's boyfriend, arrived in a vehicle driven by another civilian. The police asked him to accompany them to a Calhoun County Sheriff's Department office for an interview, and he was transported there in the back seat of a police car. At the station defendant was questioned for approximately 90 minutes by Detectives Bryan Gandy and Steve Hinkley but was not given *Miranda* warnings at any time. At the conclusion of the interrogation, he was

---

[1] We granted leave in *People v Barritt*, unpublished order of the Court of Appeals, entered July 1, 2016 (Docket No 333206).

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

handcuffed and transported to the custody of the Mt. Morris Police Department. He was later charged with multiple crimes related to the death of Wienski.[3]

Defendant brought a pre-trial motion to suppress evidence of statements he made during the deputies' questioning on the grounds that he was subject to custodial interrogation without *Miranda* warnings. The trial court conducted an evidentiary hearing at which it heard testimony from Deputy Mahan, who transported defendant to the station, and from Detective Gandy. The court also reviewed the transcript of the officers' questioning of defendant. The court granted defendant's motion, in part on reliance on MCL 763.7, and we granted the prosecution's interlocutory application for leave to appeal.

During the hearing, Mahan and Gandy each testified that, while they were at Wienski's home, defendant arrived in a vehicle driven by another civilian. Mahan testified that defendant was approached by police officers upon his arrival. Gandy testified that he was one of the officers that approached defendant and that he told defendant he wished to speak to him about Wienski. Specifically, Gandy testified that he "ask[ed] [defendant] if he would go to the Homer Police Department with us so we could sit down and talk to him in a better area rather than standing out in the grass there at the home." Gandy stated that defendant rode with Mahan to the sheriff's office. Mahan testified "I had a marked car there and I had [defendant] have a seat in the back of my car." He also explained that his vehicle was one of "a whole line" of law enforcement vehicles leaving Wienski's house. Gandy testified that police also asked the person who had driven defendant to Wienski's house to follow them to the sheriff's office, and he acknowledged that defendant was not given the opportunity to ride to the sheriff's office with this person.

Mahan testified that defendant was not handcuffed. He was not asked whether or not the back doors of the patrol car could be opened from the inside, but testified that he "let [defendant] out of the car" when they arrived at the sub-station. Defendant was then escorted into the building by Gandy and Hinkley, both of whom were armed. The building was the former township police department building, which had since been converted for use as a general township building with a section reserved for use by the sheriff's department. Gandy testified that the doors to the office are locked on the outside so that not just anyone can enter, but that the doors do not lock from the inside and so do not prevent anyone from leaving. Gandy testified that defendant was seated closer to the exit doors than was himself and Hinkley, but the record did not reveal whether it was objectively apparent that the doors were not locked from the inside.

Gandy testified that the interview was not confrontational, but the transcript of the interview contains multiple exchanges that were clearly heated, specifically when the detectives repeatedly accused defendant of not being truthful in his statements. For example, when defendant denied knowledge of what had happened to Wienski, Hinkley replied: "I don't like

---

[3] Defendant was charged with one count of felony-murder, MCL 750.316(1)(b), one count of carjacking, MCL 750.529a, one count of second-degree arson, MCL 750.73(1), one count of fourth-degree arson, MCL 750.75(1), and one count of tampering with evidence, MCL 750.483a(6)(b).

-2-

bullshit. I'm not going to bullshit you and you don't bullshit me. Listen to me, dude, I'm square business. No bullshit. Okay?"

The questioning lasted about 90 minutes. Gandy acknowledged that neither he nor Hinkley ever told defendant that he was free to leave, and the interview transcript reveals that defendant was not told that he was not under arrest until page 79 of the 90 page interview transcript and then only in response to defendant's statement "I think I need a lawyer now." When defendant responded by asking that the interview end, Hinkley twice said "we can finish at any time," but rather than ending the questioning, Hinkley continued the interrogation, saying to defendant:

> You're lying about the car. Lying, lying, lying. Okay. That's just it, period. Okay? I mean I know enough, I'm so positive about that, I will call you a liar to your face, and I don't do that to people. Okay? You lied, lied, lied. Okay? So that means to me either you did something on purpose to her or something accidentally happened to her. Okay? Now, this is a real simple choice for you. Okay? All right? This is an accident or it's on purpose. Okay? You – you got to man up sometime in your life. You've got to man up and you've got to come to some type of reasonable situation from this. Something happened. You know it happened. I know it happened. I know you're lying about the car, dude. I know you're lying about the car. I – you're lying about the car dude. I mean, I'd frickin' put my paycheck – that troubles me about her. I don't think you did it on purpose. I think it was an accident. All right, dude? I'm – I'm telling you, I'm pretty sure it was an accident. All right. You know it was an accident. I know it was an accident. What happened to her?

When defendant answered "I don't know," Hinkley responded, "you do know." Defendant again said "I don't know" and Hinkley responded, "you definitely know" and then left the room.

While Hinkley was out of the room, defendant, speaking to Gandy, asked for an attorney a second time, and Gandy responded, "We're going to wait for Detective Hinkley to come back." Shortly thereafter, Hinkley returned to the interview room with a K-9 officer and dog. The K-9 officer, Sergeant Brad, told defendant that the dog was "a good boy" and "friendly." Defendant responded to these comments about the dog by stating "I bet he has his moments where he isn't" to which Sergeant Brad responded, "Oh, he'll blow you right off your feet if I send him." While the dog remained in the room, Sergeant Brad said to defendant:

> I'm not in charge of nothing. I just stand around, do things, sit here with you while they – while they, you know discuss other information and things that might've come in . . . . But I'll tell you what, the truth always comes out.

> *   *   *

> You know what I mean? So, I guess it's one of those things if you – the sooner the truth comes out, the easier it is to – to deal with, you know what I mean?

> *   *   *

You want to make sure that you're as truthful as possible because – because you know, it's going to be rough otherwise. You see what I mean?

After Gandy explained that they were going to take defendant to the Mt. Morris Police Department, Brad stated, "Listen, John, before you go, is there anything else that you want to tell 'em? We talked for a second. I know you got something else there. I can see it written all over your face." Defendant answered, "No" and Brad said, "You can't stick with it forever, bud . . . . Just got to say – say the truth. Say what happened." Defendant again stated that he did not know what happened, and was then handcuffed for transport to Mt. Morris. At that point defendant asked, "[A]m I being arrested?" Two officers responded to the question by offering obfuscating responses.[4]

At the conclusion of the evidentiary hearing, the trial court ruled that defendant had been in custody during the questioning and so granted defendant's motion. In setting forth its reasoning, the trial court substantially relied on the statutory definition of "place of detention" provided at MCL 763.7,[5] which provides: "a police station, correctional facility, or prisoner holding facility or another governmental facility where an individual may be held in connection with a criminal charge that has been or may be filed against the individual." The trial court reasoned that because the interrogation of defendant occurred in a police station, which, by statute, constitutes a "place of detention," he was in custody for purposes of *Miranda.*

ANALYSIS

Although we reject the trial court's reliance on MCL 763.7, we agree that defendant was in custody at the time of his interrogation and so affirm.[6]

---

[4] The following exchange occurred after defendant asked if he was under arrest:

DETECTIVE GANDY: We're transporting you to another department and that's going to be up to them. But we, can't transport you without being restrained, for safety reasons.

[DEFENDANT]: He said yeah, so I am being arrested:

UNIDENTIFIED SPEAKER: I didn't say yeah.

[DEFENDANT]: I thought you said yeah.

UNIDENTIFIED SPEAKER: I didn't say nothin'.

[5] MCL 763.7 is located in Chapter III, "Rights of Persons Accused" in "The Code of Criminal Procedure," MCL 760.1 *et seq.*

[6] "We review a trial court's factual findings in a ruling on a motion to suppress for clear error." *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001). We review a trial court's

Consistent with the right against self-incrimination:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. [*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).]

In order to determine whether someone was "in custody or otherwise deprived of his freedom of action" a court is to consider "the totality of the circumstances, with the key question being whether the defendant reasonably believed that he was not free to leave." *People v Mendez*, 225 Mich App 381, 382-383; 571 NW2d 528 (1997).[7]

The trial court, while reaching the correct result, short-circuited the totality of the circumstances analysis by concluding that MCL 763.7(f) was dispositive to the question of whether or not defendant was in custody. The statute defines "place of detention" as "a police station, correctional facility, or prisoner holding facility or another governmental facility where an individual may be held in connection with a criminal charge that has been or may be filed against the individual." MCL 763.7(f). The trial court concluded that because defendant was in a location defined by the statute as a "place of detention," it meant that he was in custody for purposes of *Miranda*. The trial court erred by reading the statute so broadly. MCL 763.7 is the definitional provision that applies to MCL 763.8 and 763.10, which require that any police interview conducted in a "place of detention" be videotaped. This requirement creates a clear record of the nature of the interrogation, the actions of the police and the statements made by the defendant. It does not, however, transform all interviews that occur in places defined as a "place of detention" into "custodial interrogation" for purposes of *Miranda*.

This is demonstrated in the text of MCL 763.7 itself. Subsection (a) of that provision paraphrases the constitutional jurisprudence in its definition of "custodial detention," stating, " 'Custodial detention' means an individual's being in a place of detention because a law

---

"interpretation of the law or the application of a constitutional standard to uncontested facts" de novo. *Id*.

[7] The ultimate question or whether a person was "in custody" for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record. *Mendez*, 225 Mich. App. at 382 citing *Thompson v. Keohane*, 516 US 99, 116 S Ct 457, 133 L Ed 2d 383 (1995) superseded on other grounds by statute as stated in *McNary v Lemke*, 708 F3d 905, 915 (CA 7, 2013).

enforcement official has told the individual that he or she is under arrest or because the individual, under the totality of the circumstances, reasonably could believe that he or she is under a law enforcement official's control and is not free to leave." MCL 763.7(a). The fact that a police station is a "place of detention" is a fact that should be considered among the totality of the circumstances, but the statute also makes clear that a person can be in a police station, and can be questioned at that location, without necessarily being in custody. It further makes clear that the test of whether the person is in custody is to be determined by consideration of "the totality of the circumstances" as *Miranda* jurisprudence has always required. The U.S. Supreme Court has made clear that *Miranda* warnings need not be given "simply because the questioning takes place in the station house." *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977).

Although the trial court erred in its conclusion that MCL 763.7(f) was dispositive, we nevertheless affirm its ruling because the totality of the circumstances demonstrates that defendant was subject to custodial interrogation without the required *Miranda* warnings.[8]

The totality of the circumstances inquiry requires us to examine all of the facts surrounding the interview to determine how a reasonable person in defendant's position would have gauged the breath of his or her freedom of action. *Yarborough v Alvarado*, 541 US 652, 663; 124 S Ct 2140; 158 L Ed 2d 938 (2004). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 US 99, 112, 116 S Ct 457, 465, 133 L Ed 2d 383 (1995) (footnote omitted) superseded on other grounds by statute as stated in *McNary v Lemke*, 708 F3d 905, 915 (CA 7, 2013).

The prosecution argues that this case is comparable to *Mathiason*, where the Supreme Court held that the defendant had not been in custody while questioned at a police station. We reject this comparison as the facts described in the *Mathiason* opinion are in sharp contrast to those in this case.

First, in *Mathiason*, the officers informed the defendant that they could meet where it would be convenient for him, while in this case the officers specifically asked defendant to go to the police station, which they told him would be a "better area" for the interview. Second, in *Mathiason*, the defendant drove himself to the police station, and the officers met him there, while in this case defendant was driven to the police station in the back seat of a fully marked patrol car that was one of several in a long line of police vehicles. While officers testified that they did not force defendant to ride in the patrol car, they acknowledge that he was not given the option to ride with the civilian who had driven him to Wienski's home and who, upon police

---

[8] "Where a trial court reaches the correct result for the wrong reason, its decision need not be reversed on appeal." *People v Jory*, 443 Mich 403, 425; 505 NW2d 228 (1993).

request, was also driving to the police station.[9] Third, in *Mathiason*, upon arrival at the police station, the defendant was "immediately informed that he was not under arrest" and the pre-*Miranda* questioning lasted no more than "five minutes after defendant had come to the office." *Id.* at 492. In the instant case nearly all the questioning occurred before the police said to defendant that he was not under arrest.[10] Fourth, in this case the pre-*Miranda* interview was far longer and was marked by confrontational questioning unlike *Mathiason*. Fifth, the *Mathiason* Court noted that at the conclusion of the interview, the defendant "did in fact leave the police station without hindrance," while in the instant case, defendant was handcuffed and transported to another police department.

The prosecution points out that the door to the interview room was not locked. However, even assuming that a reasonable person would have been aware of that fact, it is clearly outweighed by other circumstances: defendant was never told that he was free to leave, the officers were armed and in uniform,[11] the questioning was at times aggressive and included repeated accusations of lying and demands that defendant change his statement.[12] An officer did eventually tell defendant that he was not under arrest, but this was very late in the interview.[13] Further, when told he was not under arrest, defendant responded "then why am I here?" This reaction is consistent with our objective reading of the officers' prior actions as custodial. When

---

[9] Not only would this person have been able to give defendant a ride to the interview, but a reasonable person would observe that another individual whom the police wished to question was driving himself to the interview whiles he was riding in the back seat of a patrol car.

[10] The officer's statement to defendant that he was not under arrest also appears inconsistent with the actual circumstances of the situation, particularly given that very shortly thereafter defendant was handcuffed and transported to another police department.

[11] The dissent's reliance on *Illinois v Perkins*, 496 US 292; 110 S Ct 2394; 110 L Ed 2d 243 (1990) is inapposite. In that case, the suspect was placed in a jail cell with a government agent who appeared in all respects to be another inmate. *Id.* at 294-295. The suspect, believing his cellmate to be another inmate, boasted to him that he had committed the subject murder and then later claimed that the statement was inadmissible because he was in custody in the cell and had not been given a Miranda warning. *Id.* at 295. The *Perkins* Court concluded that the suspect was in custody, but that there was no interrogation because "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* at 296.

[12] "[S]uch an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner." *Miranda*, 384 US at 457.

[13] Notably, the statement that defendant was not under arrest came in direct response to defendant's request for an attorney. A person could reasonably have understood it as a rebuff of his request for counsel rather than as an assurance that he had full freedom of movement.

defendant indicated that he did not want to continue the interview, the officer continued to question him and again repeatedly accused him of lying. When defendant said for a second time that he wanted a lawyer and did not want to continue the interview, a different officer, accompanied by a police dog, entered the room and continued the questioning during which he said that the dog would "blow you right off your feet if I send him." Ultimately, as soon as the police decided to end the interview, defendant was handcuffed and transported to another police department.

This case is not comparable to *Mathiason*. To the contrary, it bears multiple hallmarks of custodial interrogation. Nor is this case comparable to the other case-law cited and relied on by the prosecution. In *Mendez*, 225 Mich App at 382-383, we held that a defendant's pretrial statement to the police should not be suppressed, where the defendant "picked the time of the interview in response to a police letter requesting an interview, drove himself to the police station, was left alone and unrestrained in an interview room, and after giving written answers to some questions . . . was allowed to leave" and where "[t]he investigators testified that they informed defendant at the outset of the interview that he was not under arrest . . . ." This case is also distinguishable from *People v Zahn*, 234 Mich App 438; 594 NW2d 120 (2007) and *People v Coomer*, 245 Mich App 206; 627 NW2d 612 (2001). In the former the questioning took place in a private location of defendant's choosing, and he was told that he was not in custody or under arrest. *Zahn*, 234 Mich App at 443-444. In the latter, the questioning occurred in defendant's own apartment, and the police told her that she was not under arrest and that they would leave if she wanted them to do so. *Coomer*, 245 Mich App at 212-213.[14]

---

[14] We respectfully note that the dissent does not address the totality of the circumstances, referencing only those facts that favor a finding of non-custody. The fact that the door to the police station was not locked and the fact that defendant was not handcuffed do weigh in favor of such a conclusion, but they are by no means dispositive and are outweighed by facts supporting the opposite conclusion. Nor can we agree that the fact that the interrogation occurred in a "causal atmosphere" because the defendant was provided with a beverage and the officers ordered a pizza for themselves. Provision of a beverage does not vitiate custodial pressures, nor does it replace the *Miranda* warning as a constitutional guarantee. The dissent also refers to the fact that defendant "was told twice that he could 'end this at any time' and that he was not under arrest." However, as noted above, see page 4 of this opinion, *all* of these statements occurred on page 79 of the 90 page transcript immediately after defendant requested an attorney and indicated he did not want to continue the questioning. And immediately after making these statements, the same officer undertook the most aggressive questioning of the entire interrogation, brought in the canine, and placed defendant in handcuffs. From an objective standpoint, being told that he "could end this" and "that he was not under arrest" had little if any meaning given what occurred immediately thereafter.

Finally, we cannot agree with the dissent's characterization of a suspect being advised that he is not under arrest or permitting a defendant to leave the interview without being arrested as merely "a courtesy." In *Mathiason*, the existence of these "courtesies" constituted two of the three reasons the Court found that the defendant was not in custody. See 429 US at 495-496. That

-8-

Defendant was subject to custodial interrogation without having been provided *Miranda* warnings. Although the trial court's legal analysis was in part erroneous, it reached the correct result, and we affirm.


/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher

---

Court emphasized that the suspect "came voluntarily to the police station . . . was immediately informed that he was not under arrest [and] [a]t the close of a ½-hour interview . . . did in fact leave the police station without hindrance." *Id.* at 495. The dissent's suggestion that defendant could not have been in custody because he "was never told that he was under arrest" turns *Mathiason* and *Miranda* on their heads by suggesting that officers may act as if a suspect is in custody but avoid the need to provide *Miranda* warnings simply by not stating that the suspect is under arrest.