*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CLARENCE REED JENKINS, JR.,

Defendant-Appellant.

UNPUBLISHED
April 4, 2019

No. 339161
St. Clair Circuit Court
LC No. 16-001029-FC

Before: TUKEL, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of torture, MCL 750.85; domestic violence, third offense, MCL 750.81(2) and (4); two counts of assault with a dangerous weapon (felonious assault), MCL 750.82; and assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84. Additionally, defendant pleaded guilty to failing to comply with the registration requirements of the Sex Offenders Registration Act (SORA), MCL 28.729. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12(1)(a), to concurrent terms of imprisonment of 40 to 60 years for the torture count; 40 to 60 years for the domestic violence count; 10 to 15 years for each felonious assault count; 40 to 60 years for the AWIGBH count; and 10 to 15 years for failure to comply with SORA. Defendant now appeals as of right his convictions for torture and AWIGBH, as well as the scoring of certain offense variables under the sentencing guidelines. In a Standard 4 brief, defendant also appeals as of right his guilty plea for failure to comply with SORA on the grounds that the plea was the product of coercion. We affirm.

## I. FACTS

Defendant and the victim began dating in August 2015 and began living together in the victim's apartment in early 2016. During trial, the victim recounted several instances of verbal and physical abuse perpetrated by defendant at various times throughout their relationship. The present charges, however, stem from an instance of domestic violence that occurred on April 11, 2016. The victim testified that she was sleeping on the couch in the living room that evening when defendant woke her to ask who was sending her text messages. When the victim replied

that no one was texting her, defendant told her not to lie, began chugging liquor, and warned her that she had better run because "the [d]evil's in the house." The victim testified that, although she began to cry and begged defendant not to hit her, he repeatedly punched her in the face, knocking her backwards onto the couch with each blow. Defendant continued to hit the victim even after he shook her awake when she began to lose consciousness. As he was hitting the victim, defendant smoked a cigarette, which he put out on the victim's neck, side, and "down [her] pants" when he did not like her answer to one of his questions. When the victim continued to insist that no one had texted her, defendant picked up a table and swung it at the victim, hitting her and the couch with such force that the top panel of the table broke away from the frame. Defendant then began to choke the victim and flung her into a wall.

The victim testified that defendant then ordered her upstairs into the bathroom, where he forced her to drink his urine out of the toilet after she refused to admit to having a sexual relationship with her brother. When the victim nearly vomited, defendant threatened that she would have to drink the contents of the toilet until there was no water left. In the hopes that defendant would stop the abuse, the victim falsely admitted that she had sex with her brother. In response, defendant urinated on her head. The victim testified that defendant then broke the shower curtain rod, held it like a baseball bat, and threatened to swing it at her if she did not answer his questions. Defendant swung the rod close to the victim several times before eventually striking her with it on her side. As the victim lay on the floor crying, defendant kicked her on her side. He ordered her to take a shower because she smelled like urine and then ordered her into the bedroom, where he became calmer. However, after asking the victim another question, defendant became agitated afresh and began choking her. He then had sex with her and fell asleep. The victim testified that the attack had lasted from approximately 8:00 p.m. on April 11, 2016, until the sky began to lighten early the following morning. The victim further recalled that, throughout the entire night, defendant repeatedly threatened her, "You're going to die tonight, bitch."

After defendant fell asleep, the victim also slept and awoke in the afternoon of April 12, 2016, to defendant applying ointment to her injuries. Defendant went downstairs to answer the front door for two maintenance men; although the victim contemplated escaping at that time, she feared that it was not yet safe. Defendant returned to the bedroom, and he and the victim talked and watched a movie. The victim eventually told defendant that she was going downstairs to wash the dishes, as the sink was near the front door. Defendant followed her and paced between the kitchen and living room while she washed the dishes. The victim stated that she deliberately clattered the dishes loudly to mask any sound when she unlocked and escaped through the front door while defendant was in the living room. The victim, barefoot and wearing only a t-shirt and shorts, ran to her mother's apartment, which was located in a building adjacent to the victim's. Upon arriving, the victim immediately vomited and told her brother Marcus Jamison to lock the door. Jamison testified that he observed the victim with a black eye and spitting blood into a trash can. The victim's other brother Relashen Howard recalled that the victim was shaking when she came into his room without her shoes or coat and that her face and body were covered in marks. The victim called 911, and the police arrested defendant on April 13, 2016.

## II. ANALYSIS

### A. AMENDED INFORMATION

On appeal, defendant first contends that the trial court abused its discretion by permitting the prosecution to amend the information to add the charge of AWIGBH. Specifically, defendant maintains that the victim's testimony during the probable cause hearing was insufficient to establish the level of intent necessary to support a finding of probable cause on this charge. We disagree.

As an initial matter, the prosecution contends that, although defendant objected to the amendment of the felony complaint before the district court, he failed to preserve the issue by challenging the amendment of the information before the trial court. "Appellate review is generally limited to issues raised before and decided by the trial court." *People v Giovanni*, 271 Mich App 409, 414; 722 NW2d 237 (2006). Requiring parties to preserve their arguments by raising them before the trial court serves the interests not only of judicial economy but also of fairness in ensuring that litigants advance their positions at a time when their opponents have an opportunity to respond factually. *Napier v Jacobs*, 429 Mich 222, 228; 414 NW2d 862 (1987), quoting 3 LaFave & Israel, Criminal Procedure, § 26.5(c), pp 251-252. During the preliminary examination before the district court, defendant challenged the prosecution's motion to amend the felony complaint by arguing that a charge of AWIGBH was not supported by probable cause. Accordingly, consistent with the interests protected by the preservation requirement, the prosecution, as well as the district court, had the opportunity to consider and respond to this argument. We conclude that defendant's argument was preserved.

"A trial court's decision to grant or deny a motion to amend an information is reviewed for an abuse of discretion." *People v McGee*, 258 Mich App 683, 686-687; 672 NW2d 191 (2003). Under this standard, there may be circumstances in which there is "more than one reasonable and principled outcome." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). An abuse of discretion occurs when the trial court selects an outcome falling outside the range of reasonable and principled outcomes. *Id*. "A trial court necessarily abuses its discretion when it makes an error of law." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted).

In relevant part, MCR 6.112(H) provides that a court, "before, during, or after trial may permit the prosecutor to amend the information . . . unless the proposed amendment would unfairly surprise or prejudice the defendant." Indeed, an information is not limited only to those charges "contained within the complaint and warrant, but rather is presumed to have been framed with reference to the facts presented at the preliminary examination." *McGee*, 258 Mich App at 690-691, citing *People v Hunt*, 442 Mich 359, 363; 501 NW2d 151 (1993). Defendant is unable to demonstrate any unfair surprise or prejudice stemming from the amendment of the information. Based on the testimony presented during the probable cause hearing, the prosecutor sought at an early stage of the proceedings to add the charge of AWIGBH, and the information was amended accordingly. In fact, defendant's trial counsel admitted during the preliminary examination that the prosecution informed him of its intent to add a count of AWIGBH a week in advance. Thus, defendant is unable to demonstrate unfair surprise.

Defendant claims that he suffered prejudice because the prosecution's sole motivation for adding the AWIGBH count was to charge defendant as a fourth-offense habitual offender. However, the mere fact that a charge added to an amended information carries a more severe penalty than those charges included in the original information "does not, by itself, constitute unacceptable prejudice." *Hunt*, 442 Mich at 365. Moreover, our Supreme Court has held that the addition of an offense to an information does not result in unfair surprise or prejudice when the elements of the offense are supported by sufficient evidence and when defendant fails to suggest any manner in which his defense would have differed. *Id*. Here, defendant offers no argument regarding how his defense or strategy would have differed had he been initially charged with AWIGBH.

To the extent that defendant challenges the district court's finding of probable cause with respect to the charge of AWIGBH, this argument is unpreserved. See *People v Noble*, 238 Mich App 647, 658; 608 NW2d 123 (1999) (holding that in order to preserve the issue of whether a district court erred in binding a defendant over, the defendant must file a motion to quash before the district court). Accordingly, this Court's review is limited to determining whether defendant has established plain error affecting substantial rights. *Id*., citing *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error is plain if it is "clear or obvious," while an error affects substantial rights if it resulted in prejudice affecting the outcome of the trial court proceedings. *Carines*, 460 Mich at 763.

"The purpose of a preliminary examination is to determine whether probable cause exists to believe that a crime was committed and that the defendant committed it." *People v Bennett*, 290 Mich App 465, 480; 802 NW2d 627 (2010) (quotation marks and citation omitted). To demonstrate probable cause, the prosecution must present evidence of each element of the crimes charged sufficient "to lead a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of [the defendant's] guilt." *People v Cohen*, 294 Mich App 70, 74; 816 NW2d 474 (2011) (quotation marks and citation omitted). Because of the difficulty inherent in proving a person's state of mind, the element of intent to commit any crime may be inferred from the circumstances, and minimal circumstantial evidence will suffice. *People v Russell*, 297 Mich App 707, 721; 825 NW2d 623 (2012).

The elements of AWIGBH are: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Parcha*, 227 Mich App 236, 239; 575 NW2d 316 (1997). The intent to do great bodily harm has been defined as "an intent to do serious injury of an aggravated nature." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005). The evidence introduced during the probable cause hearing in the present case was sufficient to permit an ordinary person to entertain reasonable belief that defendant assaulted the victim with the intent to inflict serious injury. The victim testified during the hearing that defendant hit her with his fists and that he swung a table at her, hitting her on her side. She further stated that defendant grabbed the shower rod from the bathroom, threatened to hit her with it, and ultimately struck her with it. The victim also explained that the visible burns on her neck were sustained when defendant put out his cigarettes on her skin. Finally, she described that defendant urinated on her and forced her to drink his urine from the toilet by holding her neck. Because of defendant's violent and threatening behavior, the victim explained that she was fearful and did not believe that she could safely leave the apartment. When this testimony is considered in context of the significant

-4-

difference in size between the victim and defendant,[1] as well as defendant's unruly behavior during the probable cause hearing,[2] the district court did not plainly err in binding over defendant on the AWIGBH charge. Moreover, even if the district court erred in concluding that the prosecution adduced sufficient evidence to bind over defendant, such an error would be rendered harmless in light of our conclusion below that the prosecution presented sufficient evidence to sustain defendant's conviction. See *People v Libbett*, 251 Mich App 353, 357; 650 NW2d 407 (2002).

## B. SUFFICIENCY OF THE EVIDENCE

Defendant next challenges the sufficiency of the evidence supporting his convictions of AWIGBH and torture. This Court reviews de novo a defendant's claim that the evidence was insufficient to support his conviction. *People v Kosik*, 303 Mich App 146, 150; 841 NW2d 906 (2013). To sustain a conviction, a reviewing court must evaluate whether the evidence demonstrates the defendant's guilt beyond a reasonable doubt. *People v Railer*, 288 Mich App 213, 216; 792 NW2d 776 (2010). "In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt." *Kosik*, 303 Mich App at 150. Any conflicts in the evidence are to be resolved in favor of the prosecution. *Id*. at 151.

## 1. AWIGBH

With respect to his conviction for AWIGBH, defendant maintains that the evidence is insufficient to demonstrate beyond a reasonable doubt that he intended to inflict the level of injury illustrated by Michigan case law as constituting "great bodily harm." We disagree.

Again, the elements necessary to establish AWIGBH are: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *Parcha*, 227 Mich App at 239. The intent to inflict great bodily harm, or serious injury of an aggravated nature, *Brown*, 267 Mich App at 147, may be "inferred from the defendant's actions, including the use of a dangerous weapon or the making of threats," *People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014). Minimal circumstantial evidence of a defendant's state of mind is sufficient to establish intent. *Russell*, 297 Mich App at 721. Notably, although a victim's injuries may be probative of a defendant's intent, actual injury to the victim is not an element of the offense that must be proven by the prosecution. *Stevens*, 306 Mich App at 629.

---

[1] The victim is 4'11" tall and weighed approximately 118 pounds, whereas defendant is 6'3" tall and weighs 245 pounds.

[2] Defendant was held in contempt five times within the course of the hour-long probable cause hearing because of his angry outbursts, particularly during the victim's testimony.

By way of comparison, defendant cites to a variety of Michigan cases in an effort to illustrate the level of force that must be used to establish a defendant's intent to cause great bodily harm. Indeed, the conduct and harm inflicted in those cases was severe. See, e.g., *id*. (holding that the evidence was sufficient to demonstrate intent to cause great bodily harm when the defendant, brandishing a knife, made threats, instigated a fight, and wrestled the victim to the ground before stabbing him four times and puncturing a lung); *People v Wilson*, 159 Mich App 345; 406 NW2d 294 (1987) (holding that the evidence supported a conviction of AWIGBH when the defendant pointed his gun at and struck two victims, fired a shot in the air, actually shot a third victim, and fired three more shots at but missed a fourth victim).

In reliance on these cases, defendant maintains that the intent to inflict great bodily harm requires conduct just shy of murder, further arguing that defendant did not inflict any injury coming close to death. Defendant's argument is flawed in two respects. First, conduct resulting in a conviction of AWIGBH need not rise to the level of severity described in the caselaw cited by defendant. See, e.g., *People v Dillard*, 303 Mich App 372, 378-379; 845 NW2d 518 (2013), abrogated on other grounds by *People v Barrera*, 500 Mich 14; 892 NW2d 789 (2017) (evidence that the defendant pulled the victim to the ground multiple times, punched her in the face, dragged her across a driveway, choked her, and covered her mouth to muffle her screams was sufficient to permit a reasonable jury to conclude that the defendant acted with the intent to inflict great bodily harm). Second, defendant's argument is unavailing insofar as it improperly focuses on the severity of the victim's injuries. In order to prove a defendant's guilt of AWIGBH, the prosecution is not required to demonstrate that the victim sustained any injuries whatsoever. See *Stevens*, 306 Mich App at 629. Thus, although the victim in the present case did not sustain near-lethal injuries, the proper focus is on defendant's intent, which must be inferred from the nature of his attack and threats made to the victim.

Viewed in the light most favorable to the prosecution, the evidence in the present case demonstrates that defendant savagely beat and terrorized the victim over the course of many hours. He repeatedly punched the victim in her face with such force that she was thrown backwards onto the couch and began to lose consciousness. He picked up and swung a table at her, hitting her in her side, then choked her and flung her into a wall. Once in the upstairs bathroom, defendant swung at and struck the victim in her side with a shower rod and then kicked her in her side as she lay on the floor crying. In the bedroom, defendant again began choking the victim. Throughout the ordeal, defendant threatened the victim by stating, "You're going to die tonight, bitch." Especially in context of their significant difference in size and the fact that the victim was recovering from a recent caesarian section surgery, the amount of force used by defendant in the attack could have led a reasonable juror to infer that he intended to inflict serious physical harm. This Court does not interfere with the jury's role as factfinder—it is they who determine the witnesses' credibility and assign the weight to be accorded to the evidence. *Kosik*, 303 Mich App at 150. It is also the function of the jury, and not of this Court, "to determine what inferences can be fairly drawn from the evidence and to determine the weight to be afforded to the inferences." *Id*. at 150-151. We therefore conclude that the evidence presented was sufficient to sustain defendant's conviction of AWIGBH.

## 2. TORTURE

Next, defendant argues that evidence presented during trial was insufficient to sustain his conviction for torture. Specifically, defendant asserts that he neither had physical custody or control of the victim against her will, nor did he inflict great bodily injury or severe mental pain or suffering as specifically defined by statute. Again, we disagree.

The offense of torture is set forth under MCL 750.85:

(1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture . . . .

(2) As used in this section:

* * *

(b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.

* * *

(d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:

(*i*) The intentional infliction or threatened infliction of great bodily injury.

(*ii*) The administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt the senses or the personality.

(*iii*) The threat of imminent death.

(*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality.

Although no published authority exists applying the requirement that a torture victim be in the custody or physical control of a defendant, this Court has previously construed Michigan's false imprisonment statute, MCL 750.349b, which renders it unlawful to knowingly restrain another person under various circumstances. The statute defines the term "restrain" in terms

similar to those used under MCL 750.85(2)(b) to define "custody or physical control."[3]  In *Kosik*, this Court evaluated whether a victim was restrained when she was taken against her will into a windowless conference room, where the defendant stood guard at the only exit and could have prevented any escape.  *Kosik*, 303 Mich App at 152.  While the victim was not bound, gagged, or threatened, this Court held that the evidence was sufficient to establish that the defendant had "restricted the victim's movement within the bounds of the conference room" such that she was restrained.  *Id*. at 152.  In reaching this conclusion, this Court observed that the circumstances of the restraint need not be particularly egregious to satisfy the statute, which does not "require[] a certain level of difficulty of discovery or escape."  *Id*. at 153.  We find this reasoning to be equally compelling with respect to interpretation of MCL 750.85.  Indeed, the model criminal jury instructions applicable to the offense of torture provide that confinement or restriction of movement may be achieved either through force or threat of force.  See M Crim JI 17.36(2).

In the present case, the evidence sufficiently demonstrates that defendant forcibly confined the victim insofar as he used both force and threat of force to prevent her from escaping the apartment.  The victim testified multiple times that she obeyed defendant's orders and did not attempt to run away because she was terrified of further endangering herself.  She was unable to call for help because defendant had taken her cell phone.  The victim also explained that she did not attempt to escape when the maintenance men arrived at the apartment because she was uncertain whether it would be safe.  Additionally, she did not attempt to escape through her back door because defendant "would have gotten [her] faster than anything."  Even the victim's eventual escape establishes that her fears were well-founded, as defendant not only paced to and from the kitchen to monitor the victim but also arrived at the victim's mother's house only minutes after the victim.  Contrary to defendant's argument on appeal, the fact that the victim did not attempt an earlier escape does not demonstrate that she remained inside the apartment of her own accord rather than because she was forcibly confined.  The evidence that the victim was under defendant's forcible control was sufficient to support the jury's verdict.

MCL 750.85 also requires actual infliction of either great bodily injury or severe mental pain or suffering upon the victim.  The prosecution does not contend that the victim suffered great bodily injury but rather severe mental pain or suffering.  The evidence sufficiently supports that, as a result of defendant's attack, the victim suffered "a substantial alteration of mental functioning that [was] manifested in a visibly demonstrable manner."  See MCL 750.85(2)(d).  In addition to her severe emotional distress arising from the physical violence and defendant's threats that she was "going to die tonight," the victim sustained further humiliation and torment when defendant forced her to drink his urine, even when she was about to vomit, and urinated on her head.  The victim's testimony demonstrates that she cried throughout the ordeal and desperately begged defendant to stop.  She stated that during the attack she was "terrified," "scared," and "in shock."  Although defendant had previously been physically abusive toward her, the victim stated that "[t]his time felt like a nightmare."  Both of the victim's brothers

---

[3] Under MCL 750.349b(3)(a), " '[r]estrain' means to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority. . . ."

testified that the victim was visibly scared, out of breath, and shaking when she arrived at their apartment. Likewise, a responding officer stated that the victim was shaking and in fear. During the victim's testimony at trial, she became distraught, began to cry, and needed to leave the courtroom to calm herself down.

Viewing this evidence in a light most favorable to the prosecution and drawing all inferences in support of the jury's verdict, we conclude that the evidence was sufficient to permit a rational juror to find that the victim suffered severe mental pain and suffering.[4] Accordingly, we conclude that the evidence presented at trial was sufficient to support defendant's torture conviction.

## C. SCORING OF OFFENSE VARIABLES

Defendant argues that his sentence is invalid because the trial court improperly scored Offense Variables (OVs) 4, 7, 8, 10, and 19, and thus seeks resentencing. Although we conclude that the trial court erroneously scored OV 4, remand for resentencing is unnecessary because this scoring error does not alter defendant's guidelines range.

A trial court's factual determinations regarding sentencing, which must be supported by a preponderance of the evidence, are reviewed for clear error. *People v Calloway*, 500 Mich 180, 184; 895 NW2d 165 (2017). The clear error standard is satisfied "when the reviewing court is left with a definite and firm conviction that an error occurred." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). " 'Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo.' " *Calloway*, 500 Mich at 184, quoting *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). When scoring offense variables under the sentencing guidelines, a court may consider all record evidence, including the presentence investigation report, plea admissions, and testimony presented during a preliminary examination or trial. *McChester*, 310 Mich App at 358. Reasonable inferences arising from the record evidence may also be utilized to support the scoring of a variable. *People v Earl*, 297 Mich App 104, 109; 822 NW2d 271 (2012).

### 1. OV 4

OV 4, which concerns the psychological injury to a victim, requires a trial court to assess 10 points when "[s]erious psychological injury requiring professional treatment occurred" and no points when no such injury to the victim occurred. MCL 777.34(1). The statute does not require that a victim actually receive psychological treatment, only that professional treatment may be required. MCL 777.34(2); see also *People v Urban*, 321 Mich App 198, 215; 908 NW2d 564 (2017). However, "[t]here must be some evidence of psychological injury on the record to

---

[4] Defendant again relies on several unpublished Michigan cases in an effort to illustrate that the victim's injuries here do not rise to a comparable level of severity. In addition to the fact that these unpublished cases are not binding precedent, MCL 7.215(C)(1), they are also inapposite, as none involve the infliction of severe mental pain or suffering.

justify a 10-point score." *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012). A victim's fear during the commission of the charged offense, "*by itself and without any other showing of psychological harm*," is insufficient to assess 10 points for OV 4. *People v White*, 501 Mich 160, 164; 905 NW2d 228 (2017) (emphasis in original). Nor may a court simply assume that a reasonable person in the victim's position normally would have suffered serious psychological injury as a result of the crime perpetrated. *Id*. at 163.

The trial court premised its assessment of 10 points for OV 4 on the fact that the victim was emotional when delivering her trial testimony, which the court construed as "evidence of serious psychological injury that may necessitate some professional treatment at some point in time in the future." Although the victim became emotional while testifying during the probable cause hearing and at trial, her testimony regarding the psychological impact of the attack was limited to the terror she experienced during and immediately after the event. The victim did not testify regarding any lasting psychological effects stemming from the attack, nor did she offer a victim impact statement or testify during the sentencing hearing. Her emotional demeanor during her testimony could have been attributable either to the fleeting stress of reliving the ordeal or to severe emotional trauma requiring psychological treatment. In the absence of any evidence favoring the latter explanation, the trial court effectively made the improper assumption that serious psychological injury was a likely result of the attack perpetrated against the victim. Accordingly, because the trial court's factual finding that the victim suffered serious psychological injury requiring treatment is not supported by a preponderance of the evidence, the assessment of 10 points for OV 4 was clearly erroneous.

Although the trial court erroneously assessed defendant 10 points for OV 4, we conclude for the reasons set forth below that the trial court's scoring was otherwise proper. The trial court assessed defendant a total of 146 points, placing him at OV Level VI under the sentencing grid for Class A offenses. See MCL 777.62. A defendant is sentenced under OV Level VI when the offense variables are scored at 100 points or above. *Id*. Therefore, the subtraction of 10 points from defendant's aggregate score would not alter defendant's guidelines range. Under these circumstances, it is unnecessary for this Court to vacate defendant's sentence and remand for resentencing. See *People v Francisco*, 474 Mich 82, 90 n 8; 711 NW2d 44 (2006) ("Where a scoring error does not alter the appropriate guidelines range, resentencing is not required.").

2. OV 7

Under OV 7, a trial court assesses 50 points for aggravated physical abuse when "[a] victim was treated with sadism, torture, excessive brutality, or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). In scoring OV 7, a trial court must evaluate "(1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount." *People v Hardy*, 494 Mich 430, 443-444; 835 NW2d 340 (2013). Accordingly, a trial court should "consider the severity of the crime, the elements of the offense, and the different ways in which those elements can be satisfied," and then determine "the fear or anxiety associated with the minimum conduct necessary to commit the offense." *Id*. at 443. Finally, the court should view these considerations in contrast to the defendant's actions in committing the charged offenses. *Id*.

In the present case, the trial court assessed 50 points under OV 7, finding that defendant engaged in sadistic and egregious conduct designed to substantially increase the fear and anxiety the victim suffered. The trial court did not examine the "baseline" level of fear or anxiety likely generated by the minimum conduct necessary to commit AWIGBH or torture. However, the record amply supports the trial court's finding of sadism, which is statutorily defined as "conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification." MCL 777.37(3). The victim's trial testimony reveals that defendant went beyond the brutal physical violence that alone would have sustained convictions of AWIGBH and torture and additionally threatened the victim throughout the night that she was going to die. For his own gratification, defendant humiliated the victim by urinating on her and forcing her to drink his urine in fear of further abuse or death. Defendant prolonged this physical and mental torment such that it extended from approximately 8:00 p.m. until the early hours of the following morning. Such conduct went far beyond the minimum required to commit the charged offenses.

Defendant's conduct was no doubt intended to increase the victim's fear and anxiety by a considerable amount. The victim testified multiple times that she was terrified throughout the ordeal, which she described as nightmarish. She stated that she complied with defendant's orders and did not attempt to flee because she was fearful for her safety if she resisted. Indeed, achieving a victim's compliance by placing him or her in fear of imminent death constitutes conduct designed to increase the victim's fear and anxiety. See *Hardy*, 494 Mich at 445. We thus conclude that the trial court did not clearly err in assessing 50 points for OV 7.

### 3. OV 8

OV 8 instructs that 15 points be assessed when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." MCL 777.38(1)(a). Our Supreme Court has held that the term "asportation," as used in OV 8, is to be accorded its plain meaning such that *any* movement of a victim to a place of greater danger qualifies as asportation, even when it is "incidental to the commission of a crime." *Barrera*, 500 Mich at 21. Under the facts presented in *Barrera*, the Supreme Court specifically held that 15 points were properly assessed for OV 8 because the defendant moved the victim from his living room into his bedroom before sexually assaulting her. *Id.* at 21-22. The Court reasoned that the bedroom was a place of greater danger because the assault was less likely to be discovered there. *Id*. at 22.

In the instant case, the trial court assessed 15 points for OV 8. The assault began in the living room, and defendant then moved the victim upstairs, first to the bathroom and later to her bedroom. Contrary to defendant's argument on appeal, the evidence demonstrates that the upstairs bathroom and bedroom were less safe than the living room because it was less likely that the victim could escape from the second floor. By contrast, the living room was adjacent to the kitchen, where the front door was located. Accordingly, as in *Barrera*, defendant moved his victim from the living room to a location where he was less likely to be discovered and the victim was less likely to escape. The trial court did not err in assessing 15 points based on OV 8.

## 4. OV 10

The gravamen of OV 10 is that a vulnerable person was exploited. MCL 777.40; see also *People v Cannon*, 481 Mich 152, 157-158; 749 NW2d 257 (2008). "Vulnerability" is defined as "the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation." MCL 777.40(3)(c). "Exploit," in turn, is defined as "to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). OV 10 provides for the assessment of 10 points when "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b). Five points must be assessed when "[t]he offender exploited a victim by his or her difference in size or strength, or both, or exploited a victim who was intoxicated, under the influence of drugs, asleep, or unconscious." MCL 777.40(1)(c).

Here, the trial court assessed 10 points for OV 10, reasoning that "[t]he facts in this case clearly establish that [defendant] exploited a domestic relationship because he could. There was a history of it. He knew he had power and control and took advantage of it." Defendant contends that the trial court's assessment of 10 points was improper because he and the victim did not have a domestic relationship. "[T]o qualify as a 'domestic relationship,' there must be a familial or cohabiting relationship," as opposed to a mere dating relationship. *People v Jamison*, 292 Mich App 440, 447; 807 NW2d 427 (2011) (no domestic relationship existed when the defendant and the victim previously dated, continued to have infrequent sexual relations, and kept some personal belongings at each other's residences); see also *People v Brantley*, 296 Mich App 546, 555; 823 NW2d 290 (2012), abrogated on other grounds by *People v Comer*, 500 Mich 278; 901 NW2d 553 (2017) (no domestic relationship existed when the defendant and the victim no longer dated, did not continue to have sexual relations, and did not live together).

Unlike *Jamison* and *Brantley*, the facts of the instant case establish that defendant and the victim had a domestic relationship at the time of the attack. Both during the probable cause hearing and during trial, the victim testified that she and defendant began living together in early 2016, in the victim's apartment. She specifically confirmed that they were living together on April 11, 2016, when the attack occurred. During the probable cause hearing, the victim stated that defendant stayed at the apartment approximately three or four nights per week. In one of his multiple outbursts, defendant took issue with that statement, calling the victim a liar and stating, "You know I stayed there, all my clothes [are] there." Consequently, the evidence, including defendant's own admission, demonstrates that defendant and the victim were cohabiting at the time of the attack. We find the fact that defendant may not have stayed at the victim's apartment every day to be immaterial, as *Jamison* does not require that cohabitation be exclusive or daily.

Although defendant does not contest the trial court's findings that the victim was a vulnerable person who defendant exploited, we find these conclusions are supported by the record. During her trial testimony, the victim described numerous instances of domestic abuse that occurred before the attack underlying the present charges. In spite of this abuse, the victim continued her romantic relationship with defendant, believing him to be remorseful. When asked why she continued to communicate with defendant, the victim responded that she had an attachment to him. Even after the attack underlying the present charges, the victim went back to her apartment to see defendant before he was arrested, explaining that she did so because she had an "attachment issue." It is readily apparent from the victim's testimony that she was vulnerable

insofar as she was unable either to leave defendant or to resist his attempts to persuade her of his remorse, in spite of his continued abuse. Defendant, in turn, exploited the victim's susceptibility to persuasion by convincing her to continue their relationship and to permit him to live in her apartment. We therefore conclude that the trial court did not err in assessing 10 points for OV 10.

### 5. OV 19

Initially, we note that defendant failed to advance any argument regarding OV 19 beyond the conclusory statement that the score was unsupported by the record. Defendant offered no discussion regarding the trial court's rationale for assessing 15 points for OV 19 and cited to no legal authority beyond the relevant statute. It is a well-established principle of appellate practice that "[a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001) (quotation marks and citation omitted). As such, we find that defendant abandoned this issue by failing to expound on any argument. See *id.*

Even had defendant advanced a cogent argument, however, we would nonetheless conclude that the trial court properly scored OV 19, albeit on alternate grounds. OV 19 concerns a defendant's interference with the administration of justice. MCL 777.49. The statute requires, in part, that 15 points be assessed if "[t]he offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice;" 10 points if "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice;" and no points if none of the above occurred. *Id.*

The phrase "interfere with the administration of justice" is defined in accordance with its plain and ordinary meaning, "to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013). Generally, offense variables must be scored with regard to the sentencing offense alone. *People v McGraw*, 484 Mich 120, 133; 771 NW2d 655 (2009). However, because "[t]he 'administration of justice' process . . . is not commenced until an underlying crime has occurred," a trial court scoring OV 19 may consider conduct that occurred "*after the completion of the sentencing offense.*" *People v Smith*, 488 Mich 193, 195; 793 NW2d 666 (2010) (emphasis added).

The trial court assessed 15 points[5] for OV 19 on the basis that, when defendant moved into the victim's apartment in early 2016, he violated the terms of a personal protection order (PPO) in place by the power of the court to protect the victim. However, defendant violated the PPO when he moved into the victim's apartment in January or February 2016, months before the

---

[5] The prosecution erroneously stated in its appellate briefing that the trial court assessed 10 points for OV 19. In fact, the presentence investigation report recommendation was 15 points, and that is what the trial court assessed.

attack underlying the sentencing offenses occurred. Moreover, this Court has previously held that mere failure to comply with a court order does not constitute interference with the administration of justice. *Hershey*, 303 Mich App at 345 (holding that neither the defendant's failure to comply with a court order to pay child support nor his violation of the terms of his court-ordered probation hindered the administration of justice). Therefore, the trial court's rationale is insufficient to sustain its assessment of 15 points for OV 19. However, we find that the trial court's scoring of OV 19 is nonetheless supported for a different reason. See *People v Jory*, 443 Mich 403, 425; 505 NW2d 228 (1993) ("Where a trial court reaches the correct result for the wrong reason, its decision need not be reversed on appeal.").

With respect to scoring OV 19, this Court previously held that a defendant interfered with the administration of justice when he instructed his victims "not to disclose his acts or he would go to jail." *People v Steele*, 283 Mich App 472, 492-493; 769 NW2d 256 (2009) (affirming trial court's assessment of 10 points for OV 19 when the defendant discouraged victims from testifying but did not threaten them). This Court reasoned that the defendant's "admonitions to his victims were a clear and obvious attempt by him to diminish his victims' willingness and ability to obtain justice." *Id*. at 493.

Here, defendant similarly discouraged the victim from testifying. In a letter to the victim, defendant wrote, "we have to fix this asap," imploring the victim twice to contact the prosecutor to drop the charges for which defendant faced a life sentence. After describing the life he envisioned for them when he was released from jail, defendant wrote, "Baby let's make this work[.] Baby just don't show up[.]" In a second letter, defendant asked the victim to prove she was going to be a "better person" in the future and to leave the past behind. Unlike the defendant in *Steele* who was assessed 10 points, defendant's communications to the victim may be construed as threatening, supporting a score of 15 points. A threat need not be explicit. See *People v McDonald*, 293 Mich App 292, 299-300; 811 NW2d 507 (2011) (The "defendant's statements that he knew who the victim was and that his 'boys' had been watching her were obvious threats" because "[a]ny person would interpret that as an implication that she or he could be found again in the future."). In the context of testimony by two arresting officers describing defendant's threats to kill the victim when he was released, his letters could be reasonably construed as veiled threats that he would harm the victim if she did not get the charges dropped or chose to testify against him. This implication is even stronger in light of defendant's history of physically abusing the victim for perceived unfaithfulness. Accordingly, the record supports the finding that defendant used the threat of force against the victim in an effort to interfere with the administration of justice. The trial court therefore correctly scored OV 19, though for the wrong reason.

## D. GUILTY PLEA

Finally, defendant argues in his Standard 4 brief that he was coerced by trial counsel into pleading guilty to failing to comply with the registration requirements of SORA and therefore should be permitted to withdraw his plea. Specifically, defendant contends that trial counsel exerted undue pressure on him to plead guilty by declining to defend him on this charge. We disagree.

Initially, we note that appellate review of this issue is precluded under MCR 6.310(D), which provides:

> A defendant convicted on the basis of a plea may not raise on appeal any claim of noncompliance with the requirements of the rules in this subchapter, or any other claim that the plea was not an understanding, voluntary, or accurate one, *unless the defendant has moved to withdraw the plea in the trial court*, raising as a basis for withdrawal the claim sought to be raised on appeal. [(Emphasis added); see also *People v Pointer-Bey*, 321 Mich App 609, 615; 909 NW2d 523 (2017) (holding that the issue of whether a plea was knowingly and voluntarily made is preserved by filing a motion to withdraw the plea before the trial court).]

It is undisputed that defendant did not file a motion to withdraw his plea before the trial court, either before or after sentencing. Under similar circumstances, this Court declined to review a defendant's claim that his plea was the product of coercion by trial counsel when the defendant never sought to withdraw his plea before the trial court. *People v Armisted*, 295 Mich App 32, 48; 811 NW2d 47 (2011). Accordingly, we likewise conclude that appellate review is precluded.

However, even if this Court were to review this unpreserved issue, we would find no merit in defendant's claim that his plea was involuntary. This Court's review of an unpreserved claim that a plea was involuntarily made is limited to "outcome-determinative plain error." See *id*. at 46, citing *Carines*, 460 Mich at 763-764. On May 9, 2017, just before trial began, defendant pleaded guilty to failing to comply with registration requirements under SORA. Defendant agreed on the record to inform the judge if there was anything he did not understand. He stated that he understood the general nature of the charge of failing to comply with SORA, that the sentence could be up to 15 years because of the habitual fourth enhancement, and that he had a constitutional right to a trial on this charge. He further acknowledged that, by pleading guilty, he was giving up the right to appeal this conviction except by leave granted. Defendant pleaded "guilty, guilty, guilty" to the charge and stated that he was pleading guilty by his own choice; no one threatened him or promised him anything in return for his plea.

With respect to the factual basis underlying his plea, defendant testified that he was previously convicted of CSC and that he registered in accordance with SORA using his mother's address. However, defendant admitted that he never registered at his primary residence, the victim's apartment. Defendant twice confirmed that his statements were true and verified that he had no difficulty hearing or understanding what had been discussed. Defendant then confirmed his prior convictions. Both attorneys expressed their satisfaction that the trial court had complied with all applicable court rules, and only then did the court accept the plea, finding it both accurate and voluntary.

The record does not support a finding that defendant's plea was involuntary or the product of coercion. Assuming that trial counsel refused to represent defendant with respect to the SORA violation charge, the record does not demonstrate that defendant had no alternative but to plead guilty to this charge. Had defendant not wished to plead guilty, he could have requested that the trial court grant him a continuance on that charge to provide him an opportunity to seek alternate counsel. He did not do so. Rather, defendant verified before the trial court that his plea was voluntary and was not made as the result of any threat or promise.

Finally, defendant admitted to the factual basis underlying his guilty plea. Accordingly, because the record reveals no plain error in the plea proceeding, we conclude that defendant is not entitled to relief.

Affirmed.

/s/ Jonathan Tukel
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola